MC-12175

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 0:16-cv-60379-WJZ

PORT CONSOLIDATED, INC.,

      Plaintiff,

v.

INTERNATIONAL INSURANCE
COMPANY OF HANNOVER, PLC,

      Defendant,

_____/

## RESPONSE OF PORT CONSOLIDATED, INC. TO MOTION OF DEFENDANT, INTERNATIONAL INSURANCE COMPANY OF HANNOVER, PLC FOR SUMMARY JUDGMENT AND OPPOSING MEMORANDUM OF LAW

The plaintiff, Port Consolidated, Inc. ("Port"), by and through undersigned counsel, pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1, files this Response to Motion of Defendant, International Insurance Company of Hannover, PLC ("Hannover") for Summary Judgment and Opposing Memorandum of Law, and states:

### Introduction

This first party insurance claim arises out of a theft of diesel fuel from Port's unmanned commercial fueling station by drivers affiliated with Allied Trucking during 2014 and 2015 resulting in losses totaling $768,238.90. Hannover insures Port under commercial property insurance policies for the period of January 1, 2014 through January 1, 2016. Port made a claim with its insurer, Hannover, for the theft of fuel. Hannover investigated the claim for over 10 months without accepting or denying coverage for the claim. As a result, Port filed suit.

CASE NO.: 0:16−cv−60379−WJZ

## The Pleadings

In the Initial Complaint filed in 2015, Port sued for declaratory relief to determine coverage in count I and breach of contract in count II.  DE 1.  Hannover filed an answer and affirmative defenses.  DE 5.  For its second affirmative defense, Hannover took the position that any claimed loss was limited to $71,095 based on "the scheduled limit of liability for Fuel Tank Contents at the subject location."  DE 5, p. 4.  For its third affirmative defense, Hannover took the position that the claimed loss was limited to $5,000 based on the scheduled limit of liability for Business Personal Property at the subject location."  DE 5, p. 5.  Hannover filed an amended answer and affirmative defenses.  DE 6.  Its second and third affirmative defenses remained unchanged.  DE 6, pp. 4-5.  More than nine months later, Hannover sought to amend its answer and affirmative defenses yet again.  DE 28; 28-1.  At that time, nearly a year since the filing of the complaint, Hannover's second and third affirmative defenses seeking to limit the amount of damages under the policy continued to remain unchanged.  DE 28-1, pp. 4-5.

Port filed a four count amended complaint in March 2017.  DE 60.  Count I sought declaratory relief determining that Port fully complied with the policy terms requiring production of information and records and that there was coverage under the policy.  Count II contained a breach of contract claim.  Count III sought reformation of the policy and a determination that **the policy should have been issued with blanket coverage**.  DE 60, pp. 6-7.  As part of this claim, Port sought statutory attorney's fees pursuant to Fla. Stat. Sec. 627.428.  DE 60, p. 7.  Count IV sought declaratory relief regarding coverage limits and whether coverage is on a **blanket basis**.  DE 60, pp. 7-8.

Following the filing of this amended complaint, the parties entered into a Stipulation.

DE 68.  Paragraph 3 of the stipulation stated:

> With regard to policy number CPR14E0017203, which was in effect from January 1, 2014 to January 1, 2015, Port and InterHannover agree that the policy was issued with a business personal property limit of $23,015,224.  It is understood and agreed that this limit of coverage was intended to be written on a blanket basis for business personal property, fuel tank contents and stock.  As a result, the parties agree that the property coverage available in this claim under the above policy for theft of fuel from fuel tanks is $23,015,224, subject to a deductible of $1,000 per occurrence.  **Therefore, Hannover withdraws its 2nd and 3rd affirmative defenses.**  (Emphasis added).

In other words, after more than a year of pleadings, substantial discovery, and repeatedly stating and restating its second and third affirmative defenses, Hannover **finally conceded** that it was wrong about the available amount of insurance coverage under its policy!  Following the stipulation, Hannover filed its answer and affirmative defenses to the amended complaint.  DE 78.  Hannover also moved for partial dismissal of plaintiff's amended complaint.  DE 79.  Hannover sought to dismiss the two declaratory relief counts and the reformation counts.  DE 79.  With the consent of Port, the court dismissed the claim in count I for declaratory relief and denied the motion otherwise.  DE 104.  Finally, Hannover filed an amended answer and affirmative defenses to the amended complaint.  DE 107.

### Under an All Risk Policy, the Insurer Has the Burden to Prove That the Loss Arose from a Cause Excluded under the Policy

The Hannover policy provides:

**PROPERTY COVERED**

"We" cover the following property unless the property is excluded or subject to limitations.

"We" cover direct physical loss to covered property at a "covered location" caused by a covered peril.

**PERILS COVERED**

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

The commercial property policies issued by Hannover are "all risk" insurance policies. An all risk policy "covers any loss without putting upon the insured the burden of proving that the loss was due to a peril falling within the policy's coverage." *Int'l Ship Repair & Marine Servs. v. St. Paul Fire & Marine Ins. Co.*, 944 F.Supp. 886 (M.D. Fla. 1996). An all risk policy "creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 386 (5th Cir. 1981). Therefore, "in order to recover under an all risk policy, an insured must prove only the loss or damage to the insured's property while the policy was in force, with the burden then shifting to the insurer to prove that the loss arose from a cause that is excluded under the policy." *Int'l Ship Repair & Marine Servs.,* 944 F.Supp at 892 (*citing Nat'l Union Fire Ins. Co. of Pa. v. Carib Aviation,* 759 F.2d 873, 875 (11th Cir. 1985)).

### <u>Standards of Law for Interpreting Insurance Policies in Florida</u>

"Where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written." *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013).

In construing insurance contracts, the courts should read each policy as a whole while endeavoring to give every provision its full meaning and operative effect. *Id.* at 948. However, policy language is ambiguous if the language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage. *Id.* a 948. "[A]ny ambiguity which remains after reading the policy as a whole and endeavoring to give every provision its full meaning and operative must be liberally construed in favor of coverage and strictly against the insurer." *Id.* at 949-950.

## I.   COVERAGE FOR THE THEFT LOSS IS NOT PRECLUDED BY THE EXCLUSION FOR LOSSES RESULTING FROM "A DATA PROCESSING ERROR OR OMISSION IN PROGRAMING"

Hannover first argues that the theft of fuel loss is not covered as it was the result of "a data processing error or omission in programing."  This argument fails for three independent grounds.  First, the loss did not result from a "**data processing error** or omissions in programming."  In other words,  even if the loss resulted from an "error or omission in programing," any such programming error did not involve "data processing." Second, **even if** the exclusion applied (which it does not on its face), the **ensuing loss provision** in the policy provides coverage for the theft loss.  Third, the **concurring cause doctrine** would provide coverage if the court determines that two causes—a programming error **and** a theft—both combined to cause the loss.

### The Exclusion for Losses Resulting from a Data
### Processing Error or Omissions in Programming

The first exclusion relied upon by Hannover provides:

**Defects, Errors, and Omissions** -- "We" do not pay for loss which results from one or more of the following:

...

4)      a data processing error or omission in programming or giving improper instructions.

...

**But if a defect, error, or omission as described above results in a covered peril, "we" cover the loss or damage caused by that covered peril.** (Emphasis added for this sentence).

### The Loss Did Not Result from a *Data Processing* Error or Omission

The provision contains a very specific exclusion for losses resulting from "a **data processing** error or omission in programing." The phrase "data processing" modifies and limits the phrase "error or omission in programming." Consequently, even if the loss resulted from a programming error, the loss did not result from a "**data processing error or omission in programing**." That is, even if the loss resulted from an "error or omission in programing," any such programming error did not involve "data processing." Hannover could have written this exclusion broadly to exclude **any kind** of error or omission in programming. But it did not. Instead the policy limited the exclusion to losses resulting from "**data processing error** or omissions in programing." There was no "data processing" error or omission—even if there was a programing error. While the pulsar setting on the fuel dispensers was programmed or configured incorrectly, that incorrect setting was not based on a "data processing error"; it was simply set improperly.[1]

### The Ensuing Loss Provision of the Policy Provides Coverage for the Theft Loss

Second, **even if** the exclusion applied (which on its face it does not), the ensuing loss provision in the policy definitely provides coverage for the theft loss. Directly under the

_____

[1] The pulsar setting was incorrectly set at 1,000 to 1 instead of 100 to 1. SMF 8. That "data" on how to set it correctly was not in error. But the proper setting was just not used. The setting was simply programmed or configured improperly.

exclusion for "a data processing error or omission in programing," the policy provides: **"But if a defect, error, or omission as described above results in a covered peril, "we" cover the loss or damage caused by that covered peril."** This "ensuing loss" provision effectively creates an exception to the exclusion (and provides coverage)—even if the exclusion applies. Ensuing loss provisions "caution" courts not to "prematurely abort our inquiry." *Homeowners Choice Prop. & Cas.  v. Maspons*, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017).

"An ensuing loss follows as a consequence of an excluded loss, and the crux of the ensuing loss provision is that there must be a covered cause of loss that ensues from the excluded cause of loss." *Peek v. Am Integrity Ins. Co.*, 181 So. 3d 508, 512 (Fla. 2d DCA 2015). In *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 168 (Fla. 2003), the Florida Supreme Court confirmed that an ensuing loss exception is not applicable if the ensuing loss is directly related to the original excluded risk. For example, while an exclusion for "wear and tear" or deterioration might mean that a homeowner may not be compensated for a corroded drain pipe, if the homeowner suffered consequential loss as a result of the corroded pipe and the consequential or "ensuing" loss is not otherwise excluded, the loss is covered. *Maspons*, 211 So. 3d at 1069.

In *Certain Interested Underwriters at Lloyd's v. Chabad Lubavitch of Greater Ft. Lauderdale, Inc.*, 65 So. 3d 67 (Fla. 4th DCA 2011), Florida Fourth District elucidated how ensuing loss provisions work. In that case an unambiguous windstorm provision precluded coverage loss or damage caused by a windstorm. *Id.* at 69. But if the windstorm set in motion **another cause** not excluded in the policy and that intervening cause results in a

covered loss, then the windstorm exclusion does not apply and the loss is covered.  *Id.* at 70.  The court explained, for example, that if a windstorm damaged a heating system, the damages to the heating system could not be covered.  *Id.* at 70. However, if the damage to the heating system causes a fire, then the damages due to the fire could be covered under the policy.  *Id.* at 70.  In that example, the "cause of loss" is not the windstorm, but the intervening fire.  *Id.* at 70.

Similarly, in our case, even if the programming error or loss excluded **the damage to the fuel pump** from coverage, **the resulting series of theft losses would be covered under the ensuing loss provision**.  Here the ensuing loss (the theft) was not directly related to any programming error, but rather is a consequential covered loss that ensued as a result of any such programming loss which allowed the thefts to occur and go undetected for months.  While any damage to the fuel dispensers or fuel pumps (or the cost to repair any defective programming) would not be covered (and we are not seeking such damages), the ensuing theft loss is absolutely covered under the ensuing loss provision in the Hannover policy—just like the fire damages are covered in the Fourth District Court's example.  In this regard, Hannover's reliance on *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161 (Fla. 2003), is misplaced.  Unlike the facts in *Swire Pacific*, in our case there most definitely was an ensuing loss (the theft of the fuel) that was separate from the original loss (the improper programming to the fuel pumps).  See *Alton Ochsner Med. Found. v. Allendale Mut. Ins.* Co., 219 F.3d 501, 507 (5th Cir. 2000)  (."..if shoddy plumbing work caused pipes to break and a building to flood, damaging the carpet, the policy would

cover the cost of replacing the carpet but not the cost of repairing or replacing the shoddy plumbing job").

If there were any doubt that the ensuing loss provision applies, Hannover's own corporate representative certainly was not the purveyor of such doubt.  Hannover's corporate representative, Stephen Toli, flatly conceded that even if there a programming error, if that programming results in a theft which is covered peril that the **theft would be covered under the policy**.  SMF 91.  That admission by Hannover's representative slams the door shut on the ensuing loss argument, making it abundantly clear that the ensuing loss provision applies to provide coverage under the policy.

<u>The Concurring Doctrine Supports</u>
<u>Coverage if Two Causes Combine to Cause a Loss</u>

Third, the concurring cause doctrine would provide coverage if the court determines that two causes—a data processing error or omissions in programming error **and** a series of thefts—both combined to cause the loss.  In *Sebo v. American Home Assurance Company, Inc.*, 208 So. 3d 694, 696 (Fla. 2016), the Florida Supreme Court considered "whether coverage exists under [the insured's] all-risk policy when multiple perils combined to create a loss and at least one of the perils is excluded by the terms of the policy."  The court adopted the concurrent cause doctrine, which "provides that coverage may exist where an insured risk constitutes a concurrent cause of the loss even when it is not the prime or efficient cause."  *Id.* at 697-700.  Therefore, if this court determines the programming error and the subsequent theft combined "to cause a loss, it seems logical and reasonable to find the loss covered by an all-risk policy even if one of the causes is excluded from coverage."  *Id.* at 700.

CASE NO.: 0:16‒cv‒60379‒WJZ

II.    **COVERAGE FOR THE THEFT LOSS IS NOT PRECLUDED BY THE
       EXCLUSION FOR LOSSES TO ACCOUNTS RECEIVABLES THAT IS A
       RESULT OF AN ERROR OR OMISSION IN BOOKKEEPING,
       ACCOUNTING, OR BILLING**

Hannover's second argument is that the theft of fuel loss is not covered as it was the result of a loss to accounts receivables that is the result of an error or omission bookkeeping, accounting, or billing.  This argument fails based on a plain reading of the exclusion.  While Port Consolidated's billing to Allied Trucking may help demonstrate the extent of theft loss, the actual loss suffered by Port was a theft of fuel, and not a loss to accounts receivables in any fashion.  Hannover relies on the following policy exclusion:

**Accounts Receivable** -- "We" do not cover loss to accounts receivables that is a result of:

a.    An error in bookkeeping, accounting, or billing; or

b.    "your" discovery of a discrepancy in "your" books or records if an audit or inventory computation is necessary to prove the factual existence of the discrepancy.

Hannover flatly fails to demonstrate the applicability of the this exclusion. Port Consolidated did not suffer any "loss to accounts receivables."  Instead, the loss involved a series of related thefts as a result of a fuel pump deficiency.  On its face, the exclusion simply does not apply.  The evidence shows that Allied Trucking drivers stole the fuel over the course of eleven months.  The policy "cover[s] physical loss to covered property." Under the policy, "theft" "means any act of stealing." The theft caused an actual, physical loss, as contemplated by the policy.  The loss was not just a loss of accounts receivables, and there was certainly no physical loss to accounts receivable.  The loss was never on Port's accounting books.  SMF 87.  Allied Trucking drivers stole fuel, not accounts

receivables.  Fuel is covered property under the policy and there is a covered loss.  There is a direct loss to covered property here and the exclusion does not apply.  While the delay in discovering the thefts (and the delay in sending corrected invoices) may have made it more difficult to collect some of the accounts receivables, there was no "loss" to the accounts receivables.

Moreover, even if there were a loss to accounts receivables, it wasn't due to "an error in bookkeeping, accounting, or billing."  There was no error in bookkeeping, accounting, or billing.  And there is no indication that Allied Trucking would have paid Port for the theft loss even if it had been discovered and billed immediately.  So subsection (a) of the exclusion does not apply.  Neither does subsection (b), as there is an **abundance of direct evidence proving the thefts** other than through an audit or inventory control.  SMF 85.  For these additional reasons the entire exclusion simply does not apply.  Additionally, since this is an all risk policy, Hannover has the  burden to prove that the exclusion applies. It cannot meet this burden.  The exclusion does not apply.

**III.  WHERE THE INSURED IS ENTITLED TO A RULING AS A MATTER OF LAW THAT THE THEFT LOSS CONSTITUTES A SINGLE OCCURRENCE (AND THUS EXCEEDS THE $1000 DEDUCTIBLE UNDER THE POLICY), OR IN THE ALTERNATIVE, THERE ARE DISPUTED ISSUE OF MATERIAL FACT WHETHER THERE WAS A SINGLE OCCURRENCE THAT MUST BE DECIDED BY THE JURY, SUMMARY JUDGMENT FOR THE INSURER ON THAT ISSUE MUST BE DENIED.**

In its third argument, Hannover seeks a summary judgment on the basis that the theft loss suffered by Port constitutes a series of individual thefts, none of which exceeds the $1,000 policy deductible.  The court should reject this argument.  Based on the policy provisions, the facts of our case, and the relevant case law, Port is entitled to a summary

judgment on this issue.  Alternatively a jury must determine the disputed factual issue of whether the theft loss was based on a **series of related** thefts by one or more persons. If Port is entitled to a ruling as a matter of law on this issue, or if a jury answers that question in the affirmative, Port Consolidated's theft loss will be covered under the Hannover policy.  Either way, Hannover is not entitled to a summary judgment in its favor on that issue.  The motion must therefore be denied.

### The Policy Provisions Regarding to Deductible and Occurrence

In the "HOW MUCH DO WE PAY" section, the policy provides:

> **Deductible** – "We" pay only that part of "your" loss over the deductible amount states on the "schedule of coverages" in any one occurrence. The deductible applies to the loss before application of any coinsurance or reporting provisions.   [P. 28 of 31].

The DEFINITIONS section of the policy fails to define the word "occurrence."  P. 1-6

However, the policy contains **two** other sections that define occurrence and explain how the term occurrence should be interpreted under the policy.  First, in the supplemental coverage providing Terminal Access Card Coverage, the policy states:

> For the purpose of applying the deductible and the Limit of Insurance, an occurrence means an unauthorized use or **series of related** unauthorized uses involving one or more persons.... (Emphasis added).  [DE 44 at EN DELUXE Endorsement page 2 of 5].

Second, the supplemental coverage providing Employee Dishonesty states:

> Endorsement EN DELUXE further provides on page 3 of 5, in the section providing employee dishonesty coverage:

>> c. All loss or damage:

>>> I. caused by one or more persons; or
>>> ii. involving a singe act or **series of related acts**;
>>> iii. is considered one occurrence

(Emphasis added).  [DE 44 at EN DELUXE Endorsement page 3 of 5].

In addition, the policy defines "One accident" to mean: "When an initial 'accident' causes or results in other 'accidents', all of the 'accidents' will be considered 'one accident'. All 'accidents' that are the result of the same occurrence will be considered 'one accident'." Hannover's own definitions thus demonstrate that an occurrence includes a series of related unauthorized uses involving one or more persons and that all damage caused by one or more persons involving a series of related acts is considered **one occurrence**. Here all the thefts were all performed by Allied Trucking drivers and all were facilitated by the programming error to the fueling pumps or dispensers.

Reading the plain meaning of the policy and reading the policy as a whole (as Florida law requires), the word "occurrence" must be defined to include a series of related acts (here the thefts) that were facilitated by the same cause (the improper programming of the fuel pumps).  (At a minimum, the improper programing allowed the thefts to occur and go undetected for a period of months.  The improper programming set the stage, so to speak, for the resulting theft loss.)  An expansive definition of occurrence can be taken from the two definitions of occurrences that **Hannover** placed in the policy (albeit for other coverages).  Hannover is the one who failed to define occurrence in the definition of section of the policy, and a definition must come from somewhere.  Hannover can hardly complain about its own definitions being used against it.  "When an insurer fails to define a term in a policy, . . . the insurer cannot take the position that there should be a narrow, restrictive interpretation of the coverage provided." *State Comp. Health Ass'n v. Carmichael*, 706 So. 2d 319, 320-21 (Fla. 4th DCA 1997).

In addition, Blacks Law Dictionary (10th Ed.) defines "occurrence" as "[s]omething that happens or takes place; specif., an accident, event or continuing condition that results in personal injury or property damage that is neither expected nor intended from the standpoint of an insured party...."  Therefore, Blacks definition is consistent with the policy language, which defines occurrence to include a series of related acts or events or a continuing condition.

### Ambiguities in the Definition of Occurrence Must be Construed for the Insured

Alternatively, even if Hannover's own definition of occurrence cannot be used to directly fill in the missing definition, it can certainly be used to show one reasonable definition of the term occurrence.  On one hand, Port's reasonable interpretation of occurrence includes a series of related acts or events or a continuing condition.  On the other hand, Hannover's interpretation is more restrictive and include only a single theft. It would seem difficult, if not impossible, for Hannover to suggest that its own definitions of occurrence are not reasonable, especially when it has failed to provide a general definition of occurrence in the policy.  The policy language (the use of the undefined word occurrence) is therefore susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage.  As such, the ambiguity must be liberally interpreted in favor of the insured, Port, and strictly against the insurer.  Therefore, the loss in this case was one "occurrence" and the deductible should be applied only once.

### Case Law From Similar Case Supports the Conclusion
### That The Amount of the Theft Loss Exceeds the Deductible

When considering whether Port Consolidated's exceeds the $1,000 deductible, it is beneficial to review cases involving similar facts.  One appellate opinion involving

remarkably similar facts is *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.*, 45 Cal. App. 4th 565, 52 Cal. Rptr. 2d 894 (Cal. App. 1996). *EOTT* "present[ed] the question of whether an insured having suffered a $1.5 million loss as the result of over 650 thefts of the petroleum products which it markets, will be entitled to recover for such loss under its 'all risk' property insurance policy when the value of the property taken in any single theft did not exceed the $100,000 deductible provided for in the policy. The issue we are required to resolve is whether, under the facts of the case, there was but one 'occurrence' or over 650 of them." *Id.* at 568, 895. The EOTT policy failed to define occurrence. *Id.* at 569, 896. The court reversed summary judgment for the insurer because a planned and orchestrated theft of fuel would amount to a single loss to which a single deductible should apply. *Id.*

The thefts occurred when particular drivers—after pumping some gas—would disengage or disable the fuel meters, which were relied upon by EOTT to prepare customer billings. The billings thus did not reflect the true amount of fuel actually pumped. *Id.* In *EOTT* the **trial court** found that "occurrence" was not ambiguous and that each of the 653 thefts should be counted separately subject to the policy's $100,000 deductible, and that the insured could not recover because no single theft met the deductible. *Id.* at 570, 897. The **appellate court** found it unfortunate that the insurer failed to define "occurrence." *Id.* at 565, 899. The court found that as used in the policy, the term "occurrence" reasonably contemplates that multiple claim could sometimes be treated as a single occurrence or loss. *Id.* at 574, 894.

CASE NO.: 0:16‑cv‑60379‑WJZ

*EOTT* considered the case of *Appalachian Ins. Co. v. Liberty Mut. Co.*, 676 F.2d 56, 61 (3d Cir. 1982), which explained the general rule that an occurrence is determined by the cause or causes of the resulting injury and that a court must determine whether there was only one proximate, uninterrupted and continuing cause which resulted in all of the damages.  The court agreed the injuries for which Liberty was liable all resulted from a common source: Liberty's discriminatory employment policies.  *Id.* at 61.  Therefore, there was a single occurrence for purposes of policy coverage.  *Id.*  In our case, the improper programming of the fuel pumps or dispensers was such a proximate, uninterrupted and continuing cause that resulted in all of Port Consolidated's damages. All of Port Consolidated's theft losses stemmed a common source: the improper programming of the fuel pumps.

*EOTT* also considered the case of *PECO Energy Co. v. Boden*, 64 F.3d 852 (3d Cir. 1982, which presented a very similar situation.  A trucking company hired by the insured, PECO, committed over a million dollars of thefts of oil products over a period of six years.  *Id.* at 854.  The Third Circuit Court affirmed the jury's determination that each theft was part of a larger scheme to steal PECO's products and that the scheme to steal was the proximate cause of each theft.  *Id.* at 856.  The theft losses constituted part of a single occurrence.  *Id.*  Similarly, the theft losses comprised a single occurrence in our case, and were all related to the improper programming of the fuel pumps or dispensers.

"Other courts, both in California and across the country, have reached a similar conclusion when faced with a fact situation involving a series of related acts which can be attributed to a single cause; and the same principle is applied whether the coverage

involves property, liability or fidelity insurance."  *EOTT*, 45 Cal App. 4th at 576, 52 Cal Rptr. 2d at 894.  *EOTT* therefore reversed the summary judgment for the insurer on the issue. *Id.* at 565, 894.

The legal theme apparent from such cases as EOTT and PECO is that summary judgment is **improper for the insurer** when the issue involves whether a multitude of thefts constitutes a single occurrence or multiple occurrences.  In reality, the acts in our case are even stronger.  The evidence in our case demonstrates that **the improper programming of the fuel pumps or dispensers facilitated or allowed a series of theft losses to occur** and go undetected for a period of months.  Not only must Hannover's summary judgment motion be denied on this issue, but this court should grant Port a summary judgment on the "occurrence" issue.[2]  Because the undisputed evidence shows that all the fuel thefts were caused or allowed to occur by the programming error, this court should determine as a matter of law that the thefts constituted a single occurrence under the Hannover policy.  As explained, the Hannover policy defined occurrence to include a series of related events.  The EOTT and PECO cases did not contain such a broad definition of "occurrence," yet still found that the fuel thefts constituted a single occurrence.  In our case, with a broad definition of occurrence (or at the least an ambiguous failure to define occurrence), the decision is even easier.  That is, the court should determine as a matter of law that the series of fuel thefts constitutes one occurrence under the policy, or at the very least deny Hannover's motion for summary judgment.

---

[2] Pursuant to Fed. R. Civ. P. 56 (f), the court may grant summary judgment for a nonmovant after notice and a reasonable time to respond.

IV.     **WHERE HANNOVER ABANDONS A POLICY DEFENSE DENYING A BLANKET POLICY LIMIT BY STIPULATING THAT THE DEFENSE WAS BEING WITHDRAWN, HANNOVER IS NOT ENTITLED TO A JUDGMENT ON THE ISSUE; TO THE CONTRARY, PORT CONSOLIDATED IS ENTITLED TO A FAVORABLE RULING ON THE ISSUE AS WELL AS ATTORNEY'S FEES FOR OBTAINING A FAVORABLE RULING.**

In its fourth argument, Hannover seeks a summary judgment claiming there is no justiciable issue concerning the blanket limit in its policy.  Specifically, Hannover seeks a summary judgment on Port Consolidated's claims to reform the policy to reflect the existence of blanket limits under the policy and for a declaration by the court confirming such blanket limits.  Hannover's attempt to obtain a favorable ruling on the blanket limit issue seeks to pull the wool over the court's eyes.  The attempt must be denied.

In reality, Hannover abandoned an improper defense after wrongly raising it and maintaining it for more than a year, while causing its insured to engage in discovery and pleading practice while incurring substantial attorney fees during the process.  Then when it became clear to Hannover that the policy **did provide blanket coverage** (contrary to its long held defense), Hannover conceded the issue and now declares victory on it.

For the procedural background on this issue, the court should review the "Pleadings" section on pp. 2-3 of this Response.  In sum, for more than a year, Hannover repeatedly maintained its second and third affirmative defenses that essentially contested the fact that the policy was issued on a blanket coverage basis.  Consequently, Port Consolidated sought to reform the policy to include blanket coverage and sought a declaration confirming this.  Port Consolidated sought statutory attorney's fees pursuant to Fla. Stat. Sec. 627.428.  Following a year of infighting and discovery on this issue [See e.g. DE 55-1; DE 56-1], Hannover stipulated that the policy was intended to be written on a blanket basis for

theft of fuel, with more than $23 million of coverage limits.  Therefore, Hannover withdrew its 2nd and 3rd affirmative defenses, finally conceding that it was wrong about the amount of coverage under the policy.

Hannover's attempt to obtain a ruling in its favor on this issue threatens to turn the litigation on its head.  It would be absurd for Hannover to obtain a favorable summary judgment ruling on an issue about which **it conceded it was wrong**!  Were the court to allow such a maneuver, then an insurance company could simply maintain an improper coverage position for more than a year, force the insured to spend attorney's fees on motion practice and discovery, and then turn around and concede it was wrong about the issue, proclaiming victory in the matter.  Unfortunately for insurers, such a maneuver is considered a "confession of judgment" by the insurer, entitling the insured to an award of attorney's fees from the insurer.

Florida Statutes Section 627.428(1) provides for the award of attorney's fees to an insured upon the rendition of a judgment or decree against an insurer in an action between the insurer and its insured.  Using the legal fiction of a "confession of judgment," the Florida Supreme Court extended the application of the statute to cases in which the insurer settles or pays a disputed claim before rendition.  *See Wollard v. Lloyd's & Cos. of Lloyd's*, 439 So. 2d 217 (Fla. 1983).  *See also Johnson v. Omega Ins. Co.*, 200 So. 3d 1207 (Fla. 2016).  If a dispute arises between an insurer and an insured, and judgment is entered in favor of the insured, the insured is entitled to attorney's fees.  *Magnetic Imaging Systems, I, Ltd. v. Prudential Property and Casualty Insurance Company*, 847 So.2d 987, 989-990 (Fla. 3d DCA 2003).

CASE NO.: 0:16−cv−60379−WJZ

In our case, Hannover has conceded or settled a critical issue in the case regarding whether there was blanket coverage under the policy. Port Consolidated—not Hannover—is entitled to a judgment or decree reforming the policy to include blanket coverage and a declaration confirming such coverage. And Port Consolidated will be entitled to an award of attorney's fees based on such a judgment or decree or based upon Hannover's confession of judgment regarding the issue. Hannover's unfair attempt to procure a favorable judgment on this issue should be strongly rejected.

For all these reasons, Hannover's motion for summary judgment should be denied in its entirely.

**BERNSTEIN · CHACKMAN · LISS**
Counsel for Plaintiff
4000 Hollywood Blvd., Suite 610 North
Hollywood, Florida 33021
(954) 986-9600 - Telephone
(954) 929-1166 - Facsimile

By*:*   _/s/Steven J. Chackman_
**Steven J. Chackman**
Florida Bar No.: 376851
schackman@bernstein-chackman.com
mfalla@bernstein-chackman.com
cescobar@bernstein-chackman.com

### Certificate of Service

I hereby certify that on this ___**25th**___ day of June, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the service list below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for

CASE NO.: 0:16−cv−60379−WJZ

those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _____ */s/ Steven J. Chackman* _____
Florida Bar No.: 376851
schackman@bernstein-chackman.com

## Service List

Jay B. Green, Esq.
Ilana Green Kellner, Esq.
Green & Ackerman, P.A.
1200 N. Federal Highway, Suite 301
Boca Raton, FL  33432

Edward M. Koch, Esq.
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103-7395
koche@whiteandwilliams.com
Marchianoh@whiteandwilliams.com
*Pro hac vice*

NR:nr
G:\WP\MC-12175\resp mtn sum jgmt and mem law.wpd